# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 13
In the Matter of the Claim of Luis A. Vega,
       Respondent,
Postmates Inc.,
       Respondent,
Commissioner of Labor,
       Appellant.

Joseph M. Spadola, for appellant.
David M. Cooper, for respondent Postmates, Inc.
New York State AFL-CIO; Legal Services NYC et al., amici curiae.

DiFIORE, Chief Judge:

The issue before us is whether the decision of the Unemployment Insurance Appeals Board (the Board) that claimant, a former Postmates, Inc. courier, and others similarly-situated are employees for whom Postmates is required to make contributions to the unemployment insurance fund was supported by substantial evidence. Because there was

- 1 -

record support for the Board's finding that the couriers were employees, we reverse the Appellate Division order and reinstate the Board's decision.

Postmates is a delivery business that uses a website and smartphone application to dispatch couriers to pick-up and deliver goods from local restaurants and stores to customers in cities across the United States—deliveries that are, for the most part, completed within an hour. Postmates solicits and hires its couriers, who undergo background checks before being approved to work by Postmates. Once they are approved, the couriers decide when to log into the application and which delivery jobs to accept. Once a courier accepts a delivery job made available through the application, the courier receives additional information about the job from Postmates, including the destination for the delivery. After completing a job, Postmates pays the couriers 80% of the delivery fees charged to customers, and payments are made by the customer directly to Postmates, which pays its couriers even when the fees are not collected from customers. Couriers' pay and the delivery fee are both nonnegotiable.

Claimant Luis Vega worked as a Postmates courier in June 2015. Based on negative reviews from customers alleging fraudulent activity, Postmates blocked claimant from using the application. Thereafter, claimant filed for unemployment benefits. In August 2015, the Department of Labor, based in part on a statement of Mr. Vega, initially determined that claimant was an employee of Postmates, requiring that Postmates pay unemployment insurance contributions on Mr. Vega's earnings, as well as on the earnings

of "all other persons similarly employed."[1]  After Postmates disputed the determination, a hearing was held before an administrative law judge (ALJ) who sustained Postmates' objection, concluding that claimant was an independent contractor and reasoning that Postmates did not exercise sufficient supervision, direction and control over claimant to establish an employer-employee relationship.  The Commissioner appealed the ALJ's decision to the Board, which reversed the ALJ, overruled Postmates' objection and sustained the Department's initial determination that claimant was an employee.  After making findings of fact regarding the operation and logistics of Postmates' delivery business, the Board concluded that "claimant and any other on-demand couriers (delivery drivers) similarly situated" were employees because Postmates exercised, or reserved the right to exercise, control over their services.[2]

Postmates appealed to the Appellate Division.  With two Justices dissenting, the Appellate Division reversed the Board's determination and remitted to the Board for further proceedings not inconsistent with the court's decision.  The Appellate Division concluded that "[w]hile proof was submitted with respect to Postmates' incidental control over the couriers," the proof "d[id] not constitute substantial evidence of an employer-employee relationship to the extent that it fail[ed] to provide sufficient indicia of

---

[1] The parties do not dispute that, consistent with the Department's initial decision, the Board's determination imposes a contribution requirement for similarly situated couriers employed by Postmates (see Labor Law § 620[1][b]), nor does Postmates direct any argument at that aspect of the Board's decision.

[2] The record does not indicate whether Mr. Vega actually received or was eligible for unemployment insurance benefits and that issue is not before this Court.

Postmates' control over the means by which these couriers perform their work" (162 AD3d 1337, 1339 [3d Dept 2018]).  The dissenting Justices would have confirmed the Board decision, concluding that there was substantial evidence supporting its determination that claimant was an employee of Postmates.  The Commissioner appeals, pursuant to CPLR 5601 (a).

Unemployment insurance is temporary income for eligible employees who lose their jobs through no fault of their own (see Labor Law § 501).  The Commissioner of Labor is responsible for administering the State's unemployment benefits scheme (see id. § 530)—meaning the Department of Labor is the body that determines, on a case-by-case basis, whether workers are employees for whom contributions to the unemployment insurance fund must be made rather than independent contractors for whom no such contribution need be made (see id. § 570).  The Department's determinations are subject to review by the Board upon appeal (id. § 621).  A determination of the Board "if supported by substantial evidence on the record as a whole, is beyond further judicial review even though there is evidence in the record that would have supported a contrary conclusion" (Matter of Concourse Ophthalmology Assoc. [Roberts], 60 NY2d 734, 736 [1983]; see also Matter of Charles A. Field Delivery Serv. [Roberts], 66 NY2d 516, 521 [1985]).  Substantial evidence is a "minimal standard" requiring "less than a preponderance of the evidence" (Matter of Haug v State Univ. of N.Y. at Potsdam, 32 NY3d 1044, 1045 [2018] [quotation marks and citations omitted]).  As such, if the evidence "reasonably supports the [B]oard's choice, we may not interpose our judgment to reach a contrary conclusion"

(Matter of MNORX, Inc. [Ross], 46 NY2d 985, 986 [1979]; see also Matter of Villa Maria

Inst. of Music [Ross], 54 NY2d 691, 693 [1981]).

     As relevant here, under the Labor Law, "employment" is broadly defined as "any

service under any contract of employment for hire, express or implied, written, or oral"

(Labor Law § 511[1][a]).  Traditionally, the Board considers a number of factors in

determining whether a worker is an employee or an independent contractor, examining

"[a]ll aspects of the arrangement" (Villa Maria, 54 NY2d at 692).  But the touchstone of

the analysis is whether the employer exercised control over the results produced by the

worker or the means used to achieve the results (see Concourse Ophthalmology, 60 NY2d

at 736).[3]  The doctrine is necessarily flexible because no enumerated list of factors can

apply to every situation faced by a worker, and the relevant indicia of control will

necessarily vary depending on the nature of the work.[4]

---

[3] Both the dissent and the concurrence suggest that we should devise a different test for analyzing whether a worker is an employee or independent contractor.  But that assertion is neither preserved for review nor argued by any party in this Court.  As the dissent recognizes, overhauling the test "is not a task to which courts are well suited" and "is a policy question best left to the legislature" (dissenting op at 24).  The Legislature defined "employment" in the context of the unemployment insurance law.  Whether a different definition or test should now apply to employees generally, or to couriers in particular, is a policy question for the Legislature to be implemented by the administrative agency authorized to make those determinations.

[4] The factors the agency considers in assessing control will vary depending on the type of work; for example, that a worker in one industry is not limited to a particular territory (dissenting op at 14) may be irrelevant to the inquiry relating to a worker in a different industry.   Because of the variability of work relationships, employment status for unemployment insurance purposes requires a case-by-case analysis. It is nonetheless appropriate to consider precedent and view the factors in context when determining whether the Board's determination is supported by substantial evidence.  While the "nature of the work" is not determinative of whether a worker is an employee, it does impact how

Here, there is substantial evidence in the record to support the Board's determination that Postmates exercised control over its couriers sufficient to render them employees rather than independent contractors operating their own businesses. The company is operated through Postmates' digital platform, accessed via smartphone app, which connects customers to Postmates couriers, without whom the company could not operate. While couriers decide when to log into the Postmates' app and accept delivery jobs, the company controls the assignment of deliveries by determining which couriers have access to possible delivery jobs. Postmates informs couriers where requested goods are to be delivered only after a courier has accepted the assignment. Customers cannot request that the job be performed by a particular worker. In the event a courier becomes unavailable after accepting a job, Postmates—not the courier—finds a replacement. Although Postmates does not dictate the exact routes couriers must take between the pick-up and delivery locations, the company tracks courier location during deliveries in real time on the omnipresent app, providing customers an estimated time of arrival for their deliveries. The couriers' compensation, which the company unilaterally fixes and the couriers have no ability to negotiate, are paid to the couriers by Postmates. Postmates, not its couriers, bears the loss when customers do not pay. Because the total fee charged by Postmates is based solely on the distance of the delivery and couriers are not given that information in advance, they are unable to determine their share until after accepting a job. Further, Postmates

---

control is (or practically can be) manifested in a particular work environment and in this way is integral to the analysis. To recognize this – which is obvious from our precedent – is not to add a "new factor" (dissenting op at 14, 18-19) to the analysis.

unilaterally sets the delivery fees, for which it bills the customers directly through the app. Couriers receive a company sponsored "PEX" card which they may use to purchase the customers' requested items, when necessary. Postmates handles all customer complaints and, in some circumstances, retains liability to the customer for incorrect or damaged deliveries.

Postmates exercises more than "incidental control" over its couriers—low-paid workers performing unskilled labor who possess limited discretion over how to do their jobs. That the couriers retain some independence to choose their work schedule and delivery route does not mean that they have actual control over their work or the service Postmates provides its customers; indeed, there is substantial evidence for the Board's conclusion that Postmates dominates the significant aspects of its couriers' work by dictating to which customers they can deliver, where to deliver the requested items, effectively limiting the time frame for delivery and controlling all aspects of pricing and payment.

Although the operative technology has changed in the interim decades, this case is indistinguishable from Matter of Rivera, where we held that substantial evidence supported the Board's conclusion that a similar delivery person was an employee of the delivery company—even though he set his own delivery routes and did not have a set work schedule but called the company's dispatcher whenever he wished to engage in work, accepting only the jobs he desired (see Matter of Rivera [State Line Delivery Serv. – Roberts], 69 NY2d 679 [1986], cert denied 481 US 1049 [1987]; see also Matter of Di Martino [Buffalo Courier Express Co. – Ross], 59 NY2d 638 [1983]). The dissent's attempt to distinguish

Matter of Rivera, as well as its efforts to shoehorn the facts here into our precedent involving distinct industries and work conditions, is unavailing.

Matter of Yoga Vida NYC, Inc. (Commissioner of Labor), where this Court held that the Board's determination that certain yoga instructors were employees was not supported by substantial evidence, does not dictate a different result (see 28 NY3d 1013 [2016]). That decision did not change the substantial evidence standard that applies to judicial review of the Board's determinations; instead, it explicitly reaffirmed that standard. Further, as already stated, the importance of different indicia of control will vary depending on the nature of the work, and yoga instructors are not couriers. A yoga instructor provides a service that is, in some respects, unique to that instructor and his or her personal characteristics, and that was significant in Matter of Yoga Vida where the non-staff instructors were free to create their own customer following and invite students to attend their classes at competing studios. Moreover, Yoga Vida's non-staff instructors were paid only if a certain number of students attended their class and, therefore, needed to ensure some degree of a customer following to be successful. They also chose the method by which Yoga Vida would calculate their pay (either hourly or on a percentage basis). In these ways, the non-staff yoga instructors, in contrast to the other staff instructors, operated as independent contractors who were in business for themselves. The same cannot be said of the couriers here. Customers cannot choose, nor do they have reason to choose, a particular individual to perform the delivery and thus, unlike the non-staff instructors in Matter of Yoga Vida, Postmates' couriers do not have the ability to create a following or

generate their own customer base.[5] Instead, Postmates has complete control over the means by which it obtains customers, how the customer is connected to the delivery person, and whether and how its couriers are compensated. Therefore, there is record support for the Board's conclusion that Postmates exercised more than incidental control over the couriers. "There being substantial evidence to sustain the determinations, the judicial inquiry is complete" (Matter of Rivera, 69 NY2d at 682).

Accordingly, the order of the Appellate Division should be reversed, with costs, and the decision of the Board reinstated.

---

[5] Although the dissent asserts otherwise (dissenting op at 16 n 10), yoga instructors' interest in creating and maintaining their own customer followings is nothing like customers' online ratings of their Postmates couriers. Postmates customers have no ability to choose their courier when placing a delivery request. Further, there is no evidence in the record that Postmates' couriers can determine the compensation they will receive from a delivery job before accepting it (id. at 17 n 10).

Matter of Vega (Postmates)

No. 13

RIVERA, J. (concurring in result):

    According to Postmates, Inc., its "couriers"—persons who make up the company's delivery staff, like claimant Luis Vega—are independent contractors because they exercise a modicum of choice in how to conduct their work. Even a cursory look at Postmates's structure reveals the fallacy of this argument. Postmates has adopted an atomized business

- 1 -

model which prevents these workers from providing delivery services as independent business owners. During their employ, "couriers" have no meaningful way to commodify their efforts into a self-sustaining business. The structure of their work and the realities of the service economy do not permit them to develop a client base by exercising control over their business choices. To put it bluntly, Postmates did not hire entrepreneurs as delivery persons, and Postmates' attempt to create the illusion of entrepreneurialism does not transform these employees into a fleet of independent contractors.

The majority correctly describes our multi-factor test for determining whether a worker is an employee (see majority op at 7; see also Bynog v Cipriani Group, 1 NY3d 193, 198 [2003] [considering "whether the worker . . . was free to engage in other employment"]; Matter of Wells [Utica Observer-Dispatch & Utica Daily Press—Roberts], 87 AD2d 960 [3d Dept 1982], affd sub nom Matter of Di Martino [Buffalo Courier Express Co.-Ross], 59 NY2d 638 [relying on fact that workers could subcontract responsibilities and work for competitors]), and reasonably considers the Board's application of the relevant factors here.[1] Nevertheless, while the test is well-suited to most cases, it has its

---

[1] As to the majority's application of our common-law test, I disagree insofar as the majority attempts to explain the holding in Matter of Yoga Vida NYC, Inc. (Commissioner of Labor) (28 NY3d 1013 [2016]). As the Appellate Division opinion here demonstrates, Yoga Vida's erroneous focus on factors that the majority apparently believed outweighed the Board's rationale (see id. at 1016-18 [Fahey, J., dissenting]) has created confusion as to the proper application of the substantial evidence test when an employer alleges that it exercises limited to no supervision over a worker (see 162 AD3d 1337, 1339 [2018]; see also Matter of Mitchell [Nation Co. Ltd Partners—Commissioner of Labor], 145 AD3d 1404, 1406-1407 & n 1 [3d Dept 2016] [reading Yoga Vida as requiring "a more detailed, qualitative and arguably less deferential analysis of the various employment factors" than had been required by the Court's prior decisions]). Although the majority states that Yoga Vida did not purport to "change the substantial evidence standard that applies to judicial

limits and may prove difficult to apply to electronically mediated work arrangements.  I

would adopt as the better approach the Restatement of Employment Law's test for

determining employee status, which alternatively considers the worker's entrepreneurial

control over their services and the extent to which the employer "effectively prevents" such

worker control (see Restatement of Employment Law § 1.01).  Therefore, I write to clarify

how the Restatement of Employment Law test applies to Postmates and similar business

models.[2]

I.

A.  New York's Legislature Enacts the Unemployment Insurance Law to Address the

Devastating Effects of Unemployed Worker Economic Insecurity

New York's Unemployment Insurance Law is intended to "alleviat[e] the adverse

financial condition that frequently accompanies . . . the cessation of income from an

---

review of the Board's determinations" (majority op at 8), the majority reaffirms the mistake of that case by, in turn, focusing on the facts in Yoga Vida that supported a conclusion contrary to that of the Board as the basis for distinguishing that case from the instant appeal. This part of the majority analysis clouds the issue before us, for as I discuss, there is ample evidence that Vega was an employee and not a businessperson serving his own entrepreneurial interests.

[2] Contrary to the majority's assertion our rules of preservation are not implicated by my analysis.  Our task on this appeal is to decide whether substantial evidence supports the Board's determination that the couriers are employees.  The only way to do that is by determining the test for establishing an employment relationship under the Unemployment Insurance Law, which does not define an employment relationship.  We have applied common law principles to fill in this statutory gap, and the majority does so again today, acknowledging that "no enumerated list of factors can apply to every situation faced by a worker" (majority op at 5).  I consider whether, in this gap-filling role, we should apply the Restatement of Employment Law approach, which draws from the common-law test but also considers as a factor whether workers can act without impediment as entrepreneurs.  As I explain, that test addresses concerns the Court has previously raised as a basis for recognizing various relevant factors.

employer" (Matter of Van Teslaar [Levine], 35 NY2d 311, 316 [1974]).  According to the

legislature's stated public policy, which "guide[s] the interpretation and application of [the

Law],"

> "[e]conomic insecurity due to unemployment is a serious menace to the health, welfare, and morale of the people of this state.  Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden, which now so often falls with crushing force upon the unemployed worker and [the worker's] family . . . .  [T]he legislature therefore declares that in its considered judgment the public good and the well-being of the wage earners of this state require the enactment of this measure for the compulsory setting aside of financial reserves for the benefit of persons unemployed through no fault of their own" (Labor Law § 501).

Shortly after the Law was enacted, in the depths of the Great Depression, this Court rejected

a substantive due process challenge to the mandatory employer contribution provisions

adopted by the Legislature (Chamberlin, Inc. v Andrews, 271 NY 1 [1936]).  Regarding

the Law's purpose, Chief Judge Crane explained,

> "The courts can take judicial notice of the fact that unemployment for the last five or six years has been a very acute problem for State and Federal government.  There have always been from earliest times the poor and unfortunate whom the State has had to support by means of money raised by taxation.  We have had our homes for the poor and the infirm, hospitals, infirmaries and many and various means for taking care of those who could not take care of themselves. . . .
>
> "Another problem has faced society which has been a source of study, discussion, agitation and planning.  Unemployment, from whatever cause, has increased enormously in every part of the country, if not throughout the world.  Is there any means possible to provide against unemployment, the loss of work, with its serious consequences to the family, to the children and to the public at large?  When such a matter becomes general

and affects the whole body politic, a situation has arisen which requires the exercise of the reserve power of the State, if there be a practical solution. Some have suggested that for the periodical recurrence of panics and hard times, the actuary might be able to work out a scheme of insurance. We need not pause to determine whether this can be done or not. The fact is that in the past few years enormous sums of State and Federal money have been spent to keep housed and alive the families of those out of work who could not get employment. Such help was absolutely necessary, and it would be a strange kind of government, in fact no government at all, which could not give help in such trouble.

"The Legislature of the State, acting after investigation and study and upon the report of experts, has proposed what seems to it a better plan. Instead of solely taxing all the people directly it has passed a law whereby employers are taxed for the help of the unemployed, the sums thus paid being cast upon the public generally through the natural increase in the prices of commodities. Whether relief be under this new law of the Legislature or under the dole system the public at large pays the bill" (id. at 8-9).

This State's Unemployment Insurance Law was one part of a nationwide push to counter the deleterious effects of the Depression on the lives and livelihoods of working people (see generally Edwin E. Witte, Development of Unemployment Compensation, 55 Yale L J 21 [1945]). As another part of that effort, the federal government enacted the Social Security Act, which among other things provides for financial assistance to states that administer unemployment compensation laws (see id. at 28-32). The Senate Report accompanying that legislation observed that "[u]nemployment compensation is financed the world over through contributions measured as a percentage of pay roll," and found that "[p]artial compensation during a relatively short period following unemployment, while a work[er] is seeking other employment or waiting to return to [their] old job, is very properly

to be regarded as a part of the legitimate costs of production" (S Rep No 74-628, 74th Cong, 1st Sess at 12; see also Eveline N. Burns, Unemployment Compensation and Socio-Economic Objectives, 55 Yale L J 1, 7-8 [1945]). Thus, in creating modern unemployment insurance, the state and federal governments responded to the plight of workers who might be reduced to joblessness and penury by forces beyond their control, while ensuring that employers internalized part of the costs they imposed on society by terminating workers (see Labor Law § 570). The fiscal integrity of this system depends on proper classification of workers as employees, which in turn ensures an employer does not avoid its share of contributions. While by its nature the extent of misclassification in this country remains unknown, a 2000 study commissioned by the Employment and Training Administration found that at least ten per cent, and up to thirty per cent, of employers misclassified employees at that time (Lalith De Silva et al., Planmatics, Inc., Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs iii [2000]; see also Charlotte S. Alexander, Misclassification and Antidiscrimination: An Empirical Analysis, 101 Minn L Rev 907, 912-913 [2017] [collecting studies]).

Although the legislature has not defined the term "employee," it has designated certain workers as such (Labor Law § 511) and authorized the Commissioner of Labor to determine eligibility for unemployment insurance benefits for all other workers (id. §§ 596, 597, 620). This determination necessarily requires a factual finding of an employment relationship (see e.g. Matter of Conklin, 262 AD2d 687, 688 [3d Dept 1999] [Graffeo, J.]), reviewable by an Administrative Law Judge, and whose decision may be appealed to the Unemployment Insurance Appeal Board (Labor Law §§620, 622, 621, 623). However,

because the Law does not apply to independent contractors, this employee-independent contractor binary drives the administrative determinations.

If substantial record evidence supports the Board's conclusion that a worker is an employee, then the Board's determination is beyond further judicial review (see Matter of Concourse Ophthalmology Assoc. [Roberts], 60 NY2d 734, 736 [1983]). A reviewing court may not reweigh the factors considered; it may only search the record to determine whether substantial evidence supports the Board's ultimate decision (see Matter of Morton, 284 NY 167, 169-170 [1940]; see generally Matter of Stork Rest. v Boland, 282 NY 256, 267 [1940]).

B. The Multifactor Test for Determining an Employment Relationship

Under our precedent, the existence of an employer-employee relationship is measured under a multifactor test to determine the control exercised by the employer over the results produced and the means by which services are rendered, leading to the distinction between employee and independent contractor (see Matter of Empire State Towing & Recovery Assn., Inc. [Commissioner of Labor], 15 NY3d 433, 437 [2010]). The Court has recognized, however, that a variety of occupations and services covered by the law "do not lend themselves to such [employer] control" (Concourse Ophthalmology, 60 NY2d at 736). In those cases, the analysis focuses on whether the employer exercises "control over important aspects of the services performed other than results or means" (id.). In other words, in the unemployment insurance context, the level of employer control that distinguishes an employee from an independent contractor is determined by the nature of the work and the ways in which supervision is both consequential to the employer's

business and meaningfully exercised over the worker.[3]  The employer control test has its foundation in torts and the unfortunately labeled "master-servant" relationship (see Morton, 284 NY at 172-173; Restatement of Employment Law § 1.01 Comment d).  Under the common-law test, if an employer ("master") retains the right to control aspects of the services rendered, the worker is an employee ("servant") and the employer is vicariously liable for the employee's acts leading to tortious injury of a third party.[4]  The factors applied in our case law and the Board's decisions are summarized in the Restatement (First) of the Law of Agency § 220, which this Court cited approvingly in Matter of Morton (284 NY at 173 ["the degree of control which must be reserved by the employer in order to create the employer-employee relationship cannot be stated in terms of mathematical precision, and various aspects of the relationship may be considered in arriving at the conclusion in a particular case"], citing Restatement (First) of Agency § 220).

Section 220 of the Restatement (First) of the Law of Agency provides that,

> "[i]n determining whether one acting for another is a servant [i.e., an employee] or an independent contractor, the following matters of fact, among others, are considered:
> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
> (b) whether or not the one employed is engaged in a distinct occupation or business;

---

[3] While the Concourse Ophthalmology (60 NY2d 734) branch of the doctrine may have "been typically applied in the context of professionals such as physicians and attorneys" (Empire State Towing and Recovery Assn., Inc., 15 NY3d at 438), its logic has force in other areas as well.  For example, a job might not be susceptible of close control because it can "be done only one way" (S.G. Borello & Sons, Inc. v Department of Indus. Relations, 48 Cal3d 341, 345, 769 P2d 399 [1989]).

[4] A similar "control" test is applied by the federal government and by many of our sister states in similar contexts (see Eisenberg v Advance Relocation & Storage, Inc., 237 F3d 111, 114-115 [2d Cir 2000] [collecting cases]).

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer; and

(i) whether or not the parties believe they are creating the relationship of master and servant" (Restatement [First] of Agency § 220 [2]).

Since Morton, the American Law Institute has issued the Second and Third Restatements of Agency. Both retain the common law right to control test.[5] The Restatement (Third), issued in 2006, consolidated various sections of the previous iterations, including section 220, into a new section 7.07, which retains the employer right to control test and recognizes the same factors listed in the Restatement (First) and (Second), as well as the employer's control of the details of the employee's work (Restatement [Third] of Agency § 7.07, Comment *f*). Both of the newer Restatements of Agency also explain that the employer's right to control may be attenuated, and the Restatement (Third) emphasizes that "all employers retain a right of control, however infrequently exercised" (see id.). Although the definition of "servant" continues to resonate for purposes of the employer's liability to third parties, the Restatement (Second) acknowledges that certain persons not fitting the definition have been held to be employees

---

[5] The Restatement (Second), issued in 1958, adds one more factor to the original list: "(j) whether the principal is or is not in business" (Restatement [Second] of Agency § 220 [2] [j]).

for purposes of a statutory scheme unrelated to employer tort liability because such treatment furthers the legislative goals of that scheme (see Restatement [Second] of Agency § 220, Comment *g*).

## C. Restatement of Employment Law

The Restatement of Employment Law, issued in 2015, distinguishes between an employee and an independent businessperson.  Under section 1.01, titled Conditions for Existence of Employment Relationship, this Restatement explains that, when the worker and employer agree that the worker will provide services for the employer, the worker is an employee if "the employer controls the manner and means by which the individual renders services, or the employer otherwise effectively prevents the individual from rendering those services as an independent businessperson" (Restatement of Employment Law § 1.01 [a]). The analysis draws from the common-law right of control test described in the Restatements of Agency, but recognizes the test "looks not only to the principal's control of the physical details of how the service provider performs the service, but also to the principal's control of other aspects of the service provider's performance that determines whether [they are] able to provide those services as an independent businessperson" (id. Comment *e*).  Like our Court in Concourse Ophthalmology (see 60 NY2d at 736), the Restatement recognizes that some workers' roles may not be susceptible to "close employer supervision," but nevertheless they should be treated as employees (id. Comment *d*).

The Restatement further describes an "independent businessperson" as a worker who "in [their] own interest exercises entrepreneurial control over important business

decisions, including whether to hire and where to assign assistants, whether to purchase and where to deploy equipment, and whether and when to provide service to other customers" (id. § 1.01 [b]).  It further explains the distinction:

> "Under this test, employees are service providers who, because of the employer's control over their performance, do not provide their services to the employer as independent businesspersons.  In many cases, the employer exercises a degree of control over the physical details of how the services are performed that denies the service providers any ability to make entrepreneurial decisions.  In other cases, even when the employer does not closely supervise the service providers, the employer's control of such matters as the scheduling of performance, the use of equipment, and the hiring of assistants effectively prevents the service providers from making entrepreneurial decisions in their own economic interest.  By contrast, service providers who do have entrepreneurial control over business decisions can seek to increase their personal economic returns not simply by working harder in performing the service for the principal but also by working at their discretion for other customers, by hiring assistants and by deploying or substituting for labor their own equipment or capital.  Those independent businessperson-service providers are in a different economic position from employee-service providers who do not have such entrepreneurial control.  On that ground, the latter service providers have been treated differently by the employment laws" (id. Comment e).

Workers who are prevented by their employers from acting as independent businesspersons "are employees" under the second prong of the Restatement test, "regardless of the manner of their compensation or the flexibility of their work hours" (id.).

With respect to worker entrepreneurialism, Comment f further explains:

> "Under § 1.01(a)(3), the employer's close supervision of the physical details of how the service provider performs the services is sufficient, but not necessary, for employee status.  As a practical matter, an employer might not need to monitor closely the details of the work performed by an employee-

service provider because of the nature of the work performed, the place where it is performed, or the employee's skills in performing the work.  When that is true, the question of the service provider's employee status turns on whether the employer's control over the service provider's performance effectively prevents the service provider from providing the services as an independent businessperson.

"As set forth in § 1.01(a)(3) and § 1.01(b), individuals provide services as independent businesspersons if they are able to serve their own economic interests through entrepreneurial control over a significant part of their costs or opportunities for profit.  Such entrepreneurial control is control over important business decisions, such as the hiring and assignment of assistants, the purchase and use of equipment, and whether and when to serve other customers.  Employee-service providers, by contrast, can affect their remuneration or other economic interest only by working harder or more skillfully on their employer's behalf; they are not entrepreneurs operating as independent businesspersons.

"Under the foregoing test, highly skilled or highly trained professionals are employees if the employer controls the cost of providing, and the timing of, their work; such individuals can seek to improve their economic returns only by providing the employer more or better services.  The same is also true of executives who are subject only to the general control of a corporation's board of directors but who are expected to exercise their discretion solely to further the corporation's business objectives and not any independent business objectives of their own" (id. Comment f).

Notably, the Reporter's Notes to the Restatement of Employment Law highlight two important considerations relevant to a worker's exercise of entrepreneurial control.  First, "[u]nskilled workers who provide no additional input other than their own labor ordinarily will not be held to be providing services as independent businesspersons even when the employer does not control the physical details of their work performance" (id. at Reporter's

Note, Comment *f*, citing United States v Silk, 331 US 704, 716-718 [1947] and Zheng v

Liberty Apparel Co., 355 F3d 61, 68-69 [2d Cir 2003]).  Second,

> "[t]he requirement that the employment relationship
> effectively prevent the employee from rendering services as
> part of an independent business ties the entrepreneurial-control
> test to the right-to-control test.  It is the actual relationship with
> the recipient of the services that is determinative.  In order for
> a service provider to be operating an independent business,
> therefore, that relationship must not preclude the provider from
> exercising entrepreneurial control in [the worker's] own
> interest.  If the actual relationship has not changed, it should
> not be relevant that an employer has given an employee an
> opportunity to modify an employment relationship and become
> an independent business operator" (id.).

The approach of the Restatement of Employment Law addresses the concerns to

which this Court responded in Concourse Ophthalmology (60 NY2d at 736).  The

Restatement's treatment of entrepreneurial control also fits with our case law holding that

an independent contractor is their "own master" (Morton, 284 NY at 172; see also Matter

of Pedraza [Cablemasters Corp.-Hartnett], 149 AD2d 829, 830 [3d Dept 1989]

[determining that the record supported "the finding that claimant did not operate an

independent business of his own, but instead that claimant worked for the employer"]).

At the intersection of these principles are concepts of worker autonomy, employer

control over work, individual business development by a worker in furtherance of self-

interest, and the effects of worker exploitation on society and the economy.  Given our

legislature's recognition that "[e]conomic insecurity due to unemployment is a serious

menace to the health, welfare, and morale of the people of this state," and the

Unemployment Insurance Law's remedial purpose to provide benefits to workers who

become unemployed through no fault of their own, a determination about who is eligible for remuneration from the insurance fund should be informed by the realities of the worker's experience. We should not equate independent contractor status with illusory opportunities for worker entrepreneurialism.

The fact that an employer profits from unskilled labor without having to supervise a worker in the traditional sense does not render the worker an independent contractor merely by dearth of oversight. An illusory opportunity to be your own businessperson is insufficient to establish independent contractor status where the employer controls significant aspects of the work that meaningfully impact the employer-employee relationship, and by so doing, "effectively prevents the individual from rendering those services as an independent businessperson" (Restatement of Employment Law § 1.01 [a] [3]). The conditions establishing an employment relationship set forth in the Restatement of Employment Law, drawing in part from the multifactor test of the Restatement (Third) of Agency, should be applied to unemployment insurance cases.

## II. Postmates's Business Model

Postmates describes itself as "a company that created and operates a web-based and mobile Platform" which "facilitates a marketplace of deliveries from local businesses through a network of freelance Delivery Providers." Notwithstanding this attempt to distinguish itself from other delivery services, the record makes clear that Postmates is in the business of making timely deliveries and uses technology to atomize this service. Postmates does not "match" an individual who can then negotiate in their own interests the best way to meet a client's needs. Postmates' "marketplace" is illusory as Postmates'

business model depends on unskilled workers who have no ability to work as independent delivery persons and develop a client base while in Postmates' employ.

To be precise, Postmates created an algorithm that permits an individual to place an online delivery order. The request is made on the Platform and then Postmates finds a person from its pool of hired workers to make the delivery. Delivery persons—called "couriers"—access delivery assignments through the Platform, i.e., the Postmates app. Postmates does a criminal background check on couriers and trains them on how to use the app. Couriers must sign an "Independent Contractor Acknowledgement Agreement." Although couriers may use their preferred means of transportation to conduct their deliveries, they must give Postmates advance notice of their choice. Couriers log into the app at will, and may accept or decline a posted delivery assignment, but they do not receive details about the nature of the assignment in advance of acceptance. Postmates retains the right to unilaterally terminate couriers without notice, such as for poor customer ratings or other poor performance. As I discuss below, Postmates' business model depends on a delivery staff of "couriers" who are employees, not independent contractors.

### III. Restatement of Employment Law Applied to Postmates

"Couriers" do not have an exclusive employment contract with Postmates, but being able to work simultaneously for another employer does not make a courier an independent businessperson. Couriers cannot build a client-base through their business savvy; apart from the moment of delivery, customer contact is through Postmates, and customers do not choose a delivery person. Nor does the work lend itself to the "exercise[] of entrepreneurial

control over important business decisions" (Restatement of Employment Law § 1.01 [b]). Indeed, the model depends on a courier not providing the same services as an independent businessperson.

To illustrate the point, we need only consider what the parties present as a typical Postmates delivery assignment: the request to pick up a burrito bowl from a store and deliver it to the customer's home. Postmates informs couriers of the pickup location for this delivery request through the app, and once a courier accepts the assignment, Postmates forwards the details. The courier is then tracked by both Postmates and the customer. At no time during the course of this delivery does the courier make important business decisions that would serve his entrepreneurial interests. The point is to get the delivery done and get paid by Postmates. There is no value in an independent relationship with any one customer since it will not lead to economically beneficial future business. You simply cannot individually deliver enough of those types of orders to make a business out of it.[6]

During Vega's term as a courier for Postmates, he accepted approximately half of the assignments he was offered. According to his written agreement with the company, he

---

[6] The record shows that Postmates pays its couriers 80% of the fee it charges its customers, which varies based on the distance that the courier travels. According to Postmates's website, the fee varies from $0.99 to $9.99 per delivery (see Postmates, How do fees work?, available at https://support.postmates.com/buyer/articles/360032280952-article-How-do-fees-work-#:~:text=). Thus, assuming an average delivery fee of $5, a courier would make $4 per delivery. To make the New York City minimum wage of $15 per hour over a 40-hour work week (see Labor Law § 652), a courier would have to deliver 150 food orders per week over those 40 hours. Even if the courier makes the maximum of $8 per delivery every single time—an unrealistic prospect—the courier would have to make 75 deliveries per week. Setting aside the sizeable costs of healthcare and other benefits, which Postmates couriers must provide for themselves, it is obvious that these couriers cannot create an independent business out of delivering food orders or other similar items for Postmates.

carried his assigned deliveries on foot.  He was involuntarily terminated from this role based, according to Postmates, on negative customer feedback related to his failure to deliver one or more of the items assigned to him.  He was not hired as an independent contractor, and Postmates failed to provide evidence of how Vega was able to act as an entrepreneur in the course of delivering to Postmates customers.  Put another way, the record evidence showed that Vega and other similarly situated couriers "can affect their remuneration or other economic interest only by working harder or more skillfully on [Postmates'] behalf; they are not entrepreneurs operating as independent businesspersons" (Restatement of Employment Law § 1.01, Comment *f*).

The fact is that Postmates benefits from the labor of unskilled workers and persons of low income—both vulnerable to employer exploitation, as well as misclassification under the statute.  In 2015, when Vega worked for Postmates, nearly three million New Yorkers, or 15.4% of the population, lived below the poverty line; nationally, fully 14.7% of persons in the United States lived in poverty (see United States Census Bureau, Poverty: 2014 and 2015, at 3 [2016]).  Among individuals over 25, those without four-year college degrees were far more likely to be in poverty and/or unemployed (see United States Census Bureau, Income and Poverty in the United States: 2015, at 13 [2016] [poverty levels declined from 28.9% for individuals without high school degrees to 5% for those with four-year degrees]; United States Bureau of Labor Statistics, Labor Force Statistics from the Current Population Survey: 2015 Annual Averages – Household Data – Table 7: Employment status of the civilian noninstitutional population 25 years and over by educational attainment, sex, race, and Hispanic or Latino ethnicity [2015] [unemployment

levels declined from 8% for individuals without high school degrees to 2.6% for those with four-year degrees]).  The majority of workers in the app-enabled gig economy come from this economically vulnerable demographic (see United States Bureau of Labor Statistics, Electronically mediated work: new questions in the Contingent Worker Supplement 23 [Sept    2018],    https://www.bls.gov/opub/mlr/2018/article/pdf/electronically-mediated-work-new-questions-in-the-contingent-worker-supplement.pdf; see also dissenting op at 23 n 11).  Although the Unemployment Insurance Law was passed decades before the digital age, today's app-enabled gig worker is subject to the same devastating financial "insecurity" faced by prior generations of unemployed wage earners and which initially motivated legislators to act (see Labor Law § 501).

IV.  Substantial Evidence Supports the Board's Determination

The Unemployment Insurance Appeals Board's determination that claimant Vega was Postmates's employee during his tenure as a courier is supported by substantial record evidence.  I reach that conclusion by application of the Restatement of Employment Law, which considers the extent to which an employer prevents worker entrepreneurialism and the worker's exercise of entrepreneurial control over important business decisions.  The Appellate Division should be reversed and the Board's decision reinstated.

Matter of Vega (Postmates)

No. 13

WILSON, J. (dissenting):

The majority's opinion suffers from two independent defects. The first is a failure to examine the record to determine whether the findings of the Commissioner of Labor were supported by substantial evidence. Many of those findings were so lacking in support as to appear to have been cut and pasted from the decision in some other matter, or from a form list of all the possible factors that might warrant the conclusion that someone was an

employee. Under those circumstances, reversal is required. The second is a failure to recognize that the realities of the contemporary working world have outpaced our jurisprudence. The multitude of factors identified in our caselaw as pertinent to determining whether a claimant is an employee or independent contractor – reflective of a time when employees received a gold watch upon retiring from the sole company at which they spent their entire careers – coupled with our deferential standard of review, has left only two undesirable paths open: either we adhere to the caselaw and standard of review, leaving all agency decisions unreviewable, or we make haphazard reversals without explanation, based on an *ad hoc* test we do not articulate because it defies explanation. We have chosen the latter approach, which has nothing to recommend it except that it is marginally better than the former.

## I.

The majority begins by asserting that "[t]he issue before us is whether the decision of the Unemployment Insurance Appeals Board (the Board) that claimant, a former Postmates, Inc. courier, and others similarly-situated are employees for whom Postmates is required to make contributions to the unemployment insurance fund was supported by substantial evidence" (majority op at 1-2). That is not correct.

At the inception of the hearing before the ALJ, the following colloquy occurred:

> ALJ PICHARDO: This two-page document is marked as an exhibit for the record as Hearing Exhibit 1 as of today's date. And so where on this document does it say similarly situated, Ms. Claxton?
> MS. CLAXTON [Counsel for the Commissioner]: I don't see it. I don't see it, you're right.
> ALJ PICHARDO: So then it's only for --

> MS. CLAXTON: For the claimant.
> ALJ PICHARDO: -- claimant?
> MS. CLAXTON: Yes, Judge.
> ALJ PICHARDO: All right.

After the close of evidence, the ALJ reiterated that "my decision in this case . . . only relates to Mr. Vega and not any other employees."  Thus, this appeal concerns only Mr. Vega: whether there is substantial evidence supporting the determination that he was an employee of Postmates.  The Board's determination, erroneously purporting to apply its decision to all similarly situated Postmates workers, is itself a freestanding basis to reject the Board's determination (see Pell v Board of Education, 34 NY2d 222, 230-231 [1974] [the action of an administrative tribunal is arbitrary when "taken without regard to the facts"]).[1]

Anyone can download the Postmates Fleet app to become a courier for Postmates. I could be a Postmates courier, so long as I passed a criminal background check.  I could make Postmates deliveries when and where I pleased, and extemporaneously indicate my availability at moments when I need a break from the press of court business.  I could make my deliveries by any form of locomotion I choose: walk, bicycle, scooter, car, rollerblade, etc.

---

[1] Not only was Postmates given no opportunity to present evidence as to other couriers, but the parties were expressly informed by the ALJ, at the start of the hearing, that the ALJ's determination would be limited to just Mr. Vega.  That neither party addressed the ALJ's limited determination does not change that determination's scope (majority op at 3 n 1). Thus, the Board's subsequent decision, if read to impose a contribution requirement on Postmates for Mr. Vega and all other similarly situated couriers, would implicate due process concerns because Postmates was expressly instructed that the proceeding would relate solely to Mr. Vega's claim and not others similarly situated (see e.g. Martin v Ronan, 47 NY2d 488, 490 [1979]["a requisite of due process (is) the opportunity to be heard before one's rights or interests are adversely affected"]).

Luis Vega, at least briefly, thought more of the Postmates opportunity than did I. He downloaded the app, provided sufficient information to pass the criminal check, and was thereafter authorized to use the Postmates service to make deliveries. Mr. Vega indicated he would be walking to make deliveries. He first logged on to Postmates on June 8, 2015, and last logged on to Postmates on June 15, 2015. At that point, he had worked for Postmates for less than a week and had logged on 12 times for an average of 3 hours and 15 minutes at a time. During those six days, Mr. Vega rejected or ignored about 50% of the assignments offered to him. The record was unequivocal that, even if Mr. Vega requested to make a specific delivery assignment and obtained it, he could thereafter change his mind and reject it, causing it to be dumped back into the pool of assignments available to others. Mr. Vega had no set schedule; he had no supervisor[2]; and, he chose what deliveries interested him, how to perform deliveries, the route he would take, and the times at which he would log on and off. Of the jobs he accepted over those six days, "a lot of requesters' feedback" indicated that "they weren't receiving the items requested." Postmates therefore blocked Mr. Vega from the app. Mr. Vega then filed for unemployment benefits.

In its determination of the matter in August 2015, the Department of Labor classified Mr. Vega as an employee for the purposes of New York Unemployment Insurance Law. The Department of Labor's determination that Mr. Vega was Postmates'

---

[2] Postmates' witness before the ALJ, the regional manager, believed Mr. Vega had been a bicycle courier, which just goes to show how much "supervision" of Mr. Vega actually took place.

employee lists 24 factors supporting that determination.  A large number of those factual findings are directly contradicted by the record.[3]  Among those factors are:  Mr. Vega was told "when, where, and how the work was to be performed"; he was required to report to a supervisor and work an established schedule; he was required to deliver the packages within a set time; his work would be reviewed; he could not take time off without Postmates' approval; he was covered by a workers' compensation policy; he was not free to determine the route of the delivery; and, he could not perform other deliveries while on route with Postmates.

None of these factors has support in the record.  Each of those factors was undermined by the testimony before the ALJ, who found that the Postmates couriers chose when they worked, how they worked, and where they worked; couriers could and did choose their own routes; Mr. Vega was not covered by workers' compensation; couriers were free to reject, ignore, or accept assignments as they chose; and, couriers were free to work for other companies at the same time as they worked for Postmates (id.).  Although the Commissioner found that Mr. Vega "could not engage substitutes or other couriers without your permission," the record evidence was that Mr. Vega could "hand his phone to a complete stranger" to complete deliveries.  Additionally, the Department noted as a factor that: "Individuals performing such services as couriers were previously determined to be your employees."  However, the ALJ expressly stated that she was "not going to be considering it" because Postmates and its counsel "weren't aware of this determination."

---

[3] Incidentally, Mr. Vega did not appear and presented no evidence at the hearing; the sole evidence presented came from Postmates.

Moreover, counsel for the Commissioner stated, "I didn't really want to make it a part of the record," after which the ALJ reiterated, "that's not going to be before me."

Based on the record, which included both exhibits and testimony, the ALJ held that Mr. Vega was an independent contractor not entitled to unemployment benefits. Although the Board did not make any finding of fact contrary to the ALJ's findings, the Board reversed the ALJ's determination. The Appellate Division reversed the Board's determination for lack of substantial evidence, citing our decision in Yoga Vida (Matter of Vega v Postmates Inc., 162 AD3d 1337 [3d Dept 2018]). The court noted the lack of application or review process, the lack of supervision, the courier's choice to log on and accept delivery requests, the courier's choice of route and mode of transportation, the lack of a required uniform or identification, the payment system (allowing for payment only upon the completion of a delivery), and the lack of reimbursements for delivery-related expenses (id. at 1338-1339). Although some indicia of control remained, the court concluded it only showed incidental control, insufficient to render Mr. Vega an employee (id. at 1339). To recap: the Commissioner, the Board and majority conclude that Mr. Vega's slapdash week of activity made him Postmates' employee; the ALJ and Third Department concluded, as do I, that it did not.[4] What accounts for that disagreement? The failure of our precedent to keep up with the times.

_____

[4] At oral argument, counsel for the Board had difficulty pinpointing when Mr. Vega became an employee of Postmates, eventually settling for the moment he made his first Postmates delivery.

II.

"Any employer shall become liable for contributions under [Article 18, the Unemployment Insurance law] if it has paid remuneration of three hundred dollars or more in any calendar quarter" (Labor Law § 560 [1]).  "Remuneration" in this part of the Labor Law means "every form of compensation for employment paid by an employer to his employee" (Labor Law § 517 [1]) and "employment" is defined as "any service under any contract of employment for hire, express or implied, written or oral" (Labor Law § 511 [1] [a]), subject to many additions not relevant here.[5]  Thus, Postmates' obligation to pay unemployment insurance contributions for Mr. Vega turns on whether its agreement with him was "a contract of employment for hire."  That definition of "employment" is circular, so we have interpreted it to apply what is described as the "common law test" of employee status (In re Morton, 284 NY 167, 173 [1940], cf. Community for Creative Non-Violence v Reid, 490 US 730, 740 [1989]), often described as the "control test," when determining liability for unemployment insurance payments.[6]

---

[5] I note that "employment" under Article 18 expressly includes "any service by a person for an employer as an agent-driver or commission-driver engaged in distributing meat, vegetable, fruit, or bakery products; beverages other than milk; or laundry or dry-cleaning services" (Labor Law § 511 [1] [b] [1]), a definition that might arguably sweep in Mr. Vega if the record showed what he had delivered (or promised to deliver), but the parties do not direct any arguments to the possible application of this definition and accordingly I do not consider it.

[6] Of course, the Legislature may, for unemployment compensation purposes, adopt a different definition of "employee."  It has done so in other parts of the Labor Law, providing at Labor Law § 2(7) that one is employed simply when one is "permitted or suffered to work" for an employer (cf. Nationwide Mut. Ins. Co. v Darden, 503 US 318, 326 [1992] [discussing similar language in the federal Fair Labor Standards Act]). However, that broader definition does not apply to the unemployment insurance article, which uses the definition discussed above (Labor Law § 510).

Under the control test of employee status, "the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results" (Bynog v Cipriani Group, Inc., 1 NY3d 193, 198 [2003]).  We further explained that "control over the means is the more important factor to be considered," and distinguished "incidental control over the results produced without further indicia of control over the means employed to achieve the results" from other forms of control that would evince an employment relationship (Matter of Ted Is Back Corp. [Roberts], 64 NY2d at 726; see Matter of Hertz Corp. [Commissioner of Labor], 2 NY3d at 735).  However, that means-ends test coexists uneasily with a separate test, the "overall control" test, where "substantial evidence of control over important aspects of the services performed other than results or means is sufficient to establish an employer-employee relationship" (Matter of Empire State Towing and Recovery Assn., Inc., 15 NY3d 433, 437-438 [2010]; Matter of Concourse Ophthalmology Assocs., P.C., 60 NY2d 734 [1983] ["The board's determination is . . . supported by substantial evidence of control over important aspects of the services performed other than results or means"]).  The "overall control" test is said to apply only "where the details of the work performed are difficult to control because of considerations such as professional and ethical responsibilities" (Empire State Towing, 15 NY3d at 437-438).

## A.

Putting aside the clear lack of record support for a multitude of the factors relied on by the Department of Labor, the majority's conceptual error in resolving this case (and, I

suspect, a good deal of the confusion below on the application of the control test) stems from a lack of decisional clarity about what factors matter when and why. Every contractual relationship for the provision of services will involve some control – whether overall or over means-ends – being ceded to the service-provider and some control being held by the requestor. No sensible enterprise gives even an indisputably independent contractor complete control over the "results produced or the means used to achieve the results." Imagine instructing a contractor to build a house, with no specification as to the size, layout, style or features to be included (ends) or a requirement that the contractor comply with local building laws (means). Absent a more defined legal standard it is unclear how much control the employer may have over an independent contractor before that contractor becomes an "employee," or, for that matter, what makes control "incidental" as compared to non-incidental.[7]

Matters are especially unclear in the semi-professional world of the "overall control" test, which tells us only that sometimes control over "important aspects" other than ends or means matters. But even the means-ends test is no panacea. Means and ends are not perfectly polarized. Here, for example, Postmates allows its couriers to choose whatever method of delivery they wish, but had Mr. Vega opted to deliver by pogo stick, turning sushi into a poke bowl or burritos into taco salads, surely he would have been bounced from the app expeditiously. Postmates undoubtedly cares that its customers

---

[7] We have never defined "incidental control." Doing so might better allow us, even if we cannot reach consensus on what meets the substantial evidence standard, to determine when the facts are not supported by substantial evidence.

receive their dinners intact, but Postmates' concern for that end, or a ban on the means of pogo stick deliveries, does not address the question of control for employment purposes. Both the means (no pogo) and ends (no mush) would be required whether the delivery person was an independent contractor or an employee.

Because "control" standing alone is relatively unhelpful, we have responded by creating a multifactor analysis where no one factor is determinative and where, as the majority correctly observes, "no enumerated list of factors can apply to every situation faced by a worker" (majority op at 5). The Supreme Court of the United States, reviewing a similar proliferation of factors, noted dryly that "the traditional agency law criteria offer no paradigm of determinacy" (Nationwide Mut. Ins. Co. v Darden, 503 US 318, 327 [1992]). This approach has given us a hash of factors that may be held more or less probative to the "control" determination depending on who is performing the analysis; indeed, in the briefing on this case, the parties point to more than twenty factors, each supported by one or more of our cases, none of which overruled the other, all of which are claimed to bear on the control analysis. Yet without providing guidance as to which factors ought to be weighed, and how weighed, and when weighed – without providing some precision and clarity as to what the factors are meant to support – the existing paradigm ends up giving the agency free rein to make whatever legal determinations it pleases until, usually with little explanation, we reverse the Board's findings for want of "substantial

evidence" in an opinion that usually wants for substantial explanation (cf. Matter of Charles A. Field Delivery Services [Roberts], 55 NY2d 516, 517 [1985]).[8]

B.

Our inconsistent, summary precedent makes it nearly impossible to arrive at a decision in this case that seems in perfect harmony with what has come before. Reading today's decision, one might think that, in the future, the Board's employment-status determinations will unfailingly be affirmed on the grounds of substantial evidence. Instead, today's decision is just one more bounce of the ball in the opposite direction whence it came.

In 12 Cornelia St. (56 NY2d 895 [1982]), a memorandum opinion, we held that the Unemployment Insurance Appeal Board's determination that real estate salespersons were employees was not supported by substantial evidence, because that "determination must rest on evidence that the company exercises control over the results produced by its salespersons or the means used to achieve the results" – and "such control [wa]s lacking" where the salespersons: (1) were paid commissions; (2) worked whatever hours they chose;

---

[8] Of our opinions in the unemployment insurance cases since 1981, Villa Maria Inst. of Music v Ross (54 NY2d 691 [1981]), 12 Cornelia St., Inc. v Ross (56 NY2d 895 [1982]), Matter of Concourse Ophthalmology Assoc., P.C. (60 NY2d 734 [1983]), Matter of Ted Is Back Corp. (64 NY2d 725 [1984]), Matter of Rivera (69 NY2d 679 [1986]), Matter of Salamanca Nursing Home, Inc. (68 NY2d 901, 903 [1986]), Matter of Hertz Corp. (Commissioner of Labor) (2 NY3d 733 [2004]), and Matter of Yoga Vida NYC, Inc. (28 NY3d 1013 [2016]) were all summary, memoranda judgments. We have treated this question in a full opinion only in Matter of Charles A. Field Delivery Serv., Inc. (66 NY2d 516 [1985]) and Matter of Empire State Towing and Recovery Assn., Inc. (15 NY3d 433 [2010]). The profusion of summary memoranda in this area underscores the incoherence of the conventional test for independent contractor/employee status when applied to an evolving economy that encompasses new styles of working.

(3) were free to engage in outside employment; (4) bore their own expenses; (5) were not required to attend meetings or trainings; (6) paid their own premiums for health insurance; and, (7) found their own leads. Those salespeople were independent contractors even though the real estate corporation supplied them with business cards, held regular sales meetings, and provided them with workers' compensation (12 Cornelia St., Inc. v Ross, 83 AD2d 681, 682 [3d Dept 1981]). Mr. Vega – like the salespeople – was paid by commission (he received a percentage of the fee charged to the customer by Postmates for each delivery, which fee varied by distance), worked whatever hours he chose, was free to engage in outside employment, bore his own expenses, was provided no health insurance, and was not required to attend meetings or trainings (other than one initial meeting on how to use the app). Yet, despite the "evidence in the record that would have supported a contrary conclusion" (majority op at 4, citing Concourse Ophthalmology, 60 NY2d 734 [1983]), in 12 Cornelia St., we reversed the Board's determination as not supported by substantial evidence.

In Concourse Ophthalmology (60 NY2d at 736 [1983]), another memorandum decision, we upheld the Board's determination that doctors were employees, laying stress on the alleged employer's control of: (1) employee schedules; (2) the place of employment; (3) the appointment-making process; (4) the fee schedule; (5) ownership of key equipment; (6) administration of bills; and, (7) allocation of record-keeping responsibilities, even though the purported employer did not control the "results or means" of the doctors' work. However, those doctors maintained their own malpractice insurance, operated substantial outside practices, and "functioned completely autonomously" (Matter of Concourse

Ophthalmology Assocs., P.C., 89 AD2d 1047, 1048 [3d Dept 1982] [Levine, J., dissenting]). We did not dispute the putative employer's contention that "the record is devoid of evidence of control over results or means." Instead, we brushed the means-ends test aside because "professional services do not lend themselves to such control." Thus, we affirmed the Board's decision on the grounds that substantial evidence existed in the record. Following that precedent, then, where the factors cut in different directions, the Board may have had "substantial evidence" for its determination here, because Postmates controlled the delivery-assignment process, the fee schedule, administration of bills and allocation of record-keeping responsibilities, even though the first two factors we cited in Concourse Ophthalmology (regular work schedule and employer determination of place of work) cut against finding Mr. Vega an employee.

In yet another memorandum, we reversed the Board's decision that salespeople for an aluminum siding installation company were employees, holding that decision was not supported by substantial evidence (Ted Is Back, 64 NY2d at 726; see also Matter of Ted Is Back Corp., 103 AD2d 932, 932 [3d Dept 1984]). We held that "incidental control over the results produced without further indicia of control over the means employed to achieve the results will not constitute substantial evidence of an employer-employee relationship" (Ted Is Back, 64 NY2d at 726). That "incidental control" included the corporation's supply of form contracts and its retained right to approve contracts (id.). That the salespeople were "agents" of the company was not "decisive, for this is equally true where salespeople are determined to be independent contractors" (id.). The Court cited factors including that the salespeople: (1) worked at their own convenience; (2) were free to hold outside

employment; (3) were not limited to a particular territory; and, (4) were paid on commissions.  Applying that analysis to this case, we would affirm the order of the Appellate Division that the Board lacked substantial evidence for its determination because each of the above factors from Ted Is Back applies to Mr. Vega; that "incidental control" is insufficient, as a matter of law, to deem Mr. Vega an employee.

We yet again reversed the decision of the Board that a salesperson was an employee, on the ground that substantial evidence did not support its determination in Hertz (2 NY3d at 733).  There, the claimant was a salesperson for Hertz: she visited travel agencies to promote Hertz's products by making presentations and distributing sales materials (id. at 734-735).  She was compensated per-visit, was not required to attend meetings, and had minimal supervision (id. at 735).  On the other hand, Hertz told her what to wear during her visits, instructed her on what products to promote, barred her from promoting competing products, and instructed her on how to present Hertz products (id.).  Despite those factors, which could have supported the Board's determination under the substantial evidence standard, we said that she was not an employee as a matter of law, because Hertz exerted merely "incidental control" (id.).  Mr. Vega was compensated per delivery; the Hertz salesperson per visit.  Mr. Vega was told where and what to pick up and deliver, just as the Hertz representative was told what products to promote.  Neither was supervised; neither had to attend meetings.  But Mr. Vega was not prohibited from delivering for competing services even while engaged in a Postmates delivery and could wear whatever he liked.  Hertz would lead one to conclude that the order of the Appellate Division must be affirmed here because the factors determining Mr. Vega's status point more strongly to

independent contractor than the factors on which we reversed the Board's determination in

Hertz.

Our most recent decision in this area, also a memorandum, is Yoga Vida. There, as

here, the Department of Labor initially determined Yoga Vida was liable for

unemployment insurance for its non-staff yoga instructors; as here, an ALJ overruled that

determination; next, the Unemployment Insurance Appeal Board reversed the ALJ's

decision, sustaining the Department's initial determination (Yoga Vida, 28 NY3d at 1015).

The Appellate Division sustained the Board's determination that the non-staff yoga

instructors were employees. We reversed, holding the Board's determination was not

supported by substantial evidence because the non-staff instructors made their own

schedules, were paid only if students attended their classes, could work for competitors,

and were not required to attend meetings or trainings (id.).[9] Each of those factors – which

are the factors that justified our reversal as a matter of law – is true as to Mr. Vega: Mr.

Vega made his own schedule, was paid only for deliveries he made, could work and

perform deliveries for other companies even while making deliveries for Postmates, and

was not required to attend meetings or trainings. Moreover, Mr. Vega did not have to work

on a prearranged schedule; the non-staff instructors did. Mr. Vega did not have to work at

_____

[9] The majority's claim that our decision in Yoga Vida "reaffirmed" the substantial evidence standard (majority op at 8) illustrates the amorphousness of that standard when applied in the unemployment insurance context. For example, even though "Yoga Vida generally determines what fee is charged and collects the fee directly from the students … [that] does not supply sufficient indicia of control over the instructors" to constitute substantial evidence of employment (Yoga Vida, 28 NY3d at 1016). If the majority is reaffirming the standard we applied in Yoga Vida, that standard has become so elastic as to be whimsical.

his employer's place of business; the non-staff instructors did.   In <u>Yoga Vida</u>, we emphasized that Yoga Vida's determination and collection of the fees that the non-staff instructors received did "not supply sufficient indicia of control" (<u>id.</u> at 1016).   So too, Postmates' control over the fees Mr. Vega received should be insufficient to support an employer-employee relationship.[10]  That the outcome today is the diametric opposite of the outcome arrived at just three years ago in <u>Yoga Vida</u>, an outcome that the majority contends was reached by the same standard as applied here (majority op at 8), shows just how inconstant our "test" has become.

The facts surrounding Mr. Vega's six-day adventure as a courier neatly fit into the exertion of mere "incidental control," which does not provide substantial evidence for a Board's determination of employee status (<u>see e.g.</u> <u>Ted Is Back</u>, 64 NY2d at 726).  Mr. Vega retained more than just "some independence to choose [his] work schedule and delivery route" (majority op at 6) – he had complete control over his schedule, the hours he logged on, the jobs he accepted or rejected (or rejected even after accepting them), and

---

[10] The majority cites a few other distinctions between the non-staff yoga instructors and Mr. Vega, but those sound more different than they really are.  The yoga instructors' interest in maintaining a "customer following to be successful" is akin to the customer ratings Mr. Vega needed to remain successful on the Postmates app (majority op at 7).  Likewise, the ability of the yoga instructors to affect their compensation to some degree by choosing hourly compensation or a percentage of class fees corresponds to Mr. Vega's ability to affect his compensation by taking, e.g., high dollar volume jobs or short-haul jobs that he could consolidate and deliver simultaneously.  Indeed, Mr. Vega had more control of his compensation than did the yoga instructors, inasmuch as he could accept a job, immediately see the compensation he would receive from it, and reject it if it was not to his liking.  There is nothing to suggest the yoga instructors could decline to teach a class or switch from percentage to hourly compensation if only two customers appeared for class.

the routes he took when, having accepted a job, he actually made the promised delivery. Nor does Mr. Vega need to have actual control over "the service Postmates provides its customers" (majority op at 6 [emphasis added]), for that is not the test. The control test applies only to the company's control over the worker's labor; the worker need not have control over, or anything to do with, the service provided by the company. Our precedent may not be consistent, and it certainly makes it difficult for litigants and lower courts to apply the control test, but at least it provides this answer: Mr. Vega is far more an "independent contractor" than the real estate salespeople given business cards by their company in 12 Cornelia St., the product promoter who was told what to wear and how to present in Hertz, or the yoga instructors told when, where and what to teach in Yoga Vida.

III.

The overarching problem in our control test jurisprudence is exemplified by Mr. Vega's case. The parties here attempt to rely on two dozen different factors, all of which derive from previous Court of Appeals' decisions and all of which we have suggested may have some bearing on the control analysis. However, those factors fail to aid us in this decision. Factors that seem in some of our cases to provide support for the determination of an employer-employee relationship do not always do so (compare Concourse Ophthalmology, 60 NY2d at 736 [where the company collected and determined fees, supporting the decision that ophthalmologists were employees] with Yoga Vida, 28 NY3d at 1017 [Fahey, J., dissenting] [where Yoga Vida collected and fixed the fees of the non-staff instructors, but substantial evidence did not support the Board's decision that the non-

staff instructors were employees]),[11] whereas factors that we previously identified as showing merely incidental control insufficient to establish an employment relationship, such as setting one's own schedule, the ability to work for other companies, and being paid on commission (see e.g. Ted Is Back, 64 NY2d at 726) are today eschewed by the majority.

It is no surprise, then, that reading the procedural history of this case or our prior decisions feels like watching a ping-pong match: no one, not even this Court, knows which combinations of factors are determinative and which are not. We have held that no one factor is determinative (Concourse Ophthalmology, 60 NY2d at 736), and the majority emphasizes the formlessness of our jurisprudence by observing that "no enumerated list of factors can apply to every situation faced by a worker" (majority op at 5). At the same time, the majority adds a new factor to the list: "the nature of the work" (id.). It wields that new factor based on unsupported judgments, contrasting couriers as "low-paid workers performing unskilled labor who possess limited discretion over how to do their jobs" (id. at 6), with yoga instructors who perform work that "is not comparable to that of a delivery person," because a yoga instructor provides a "service . . . unique to that of the instructor and his or her personal characteristics" (id. at 7). We have never before mentioned the "nature of the work" in the employment context, let alone held that factor determinative in such cases.[12]

---

[11] Judge Rivera's concurring observation that Yoga Vida was wrongly decided further emphasizes the incoherence of our decisional law in this area.

[12] Although the majority points to no prior precedent of ours listing "nature of the work" among the factors to be considered, we are advised that because "indicia of control will vary depending on the nature of the work," it is "obvious" that nature of the work should be included in the list of factors (majority op at 5 n 3, 8). I do not think it "obvious" – one

In any event, adding that factor to our litany makes no sense. The purpose of the control test, and even the variegated factor analysis, is to prevent the over-reliance on the *kind* of work in the determination of employment status. Forcing that factor into the control test provides the opportunity for every courier – regardless of any analysis of the factors or the degree of control exerted over them – to be an employee because of the nature of delivery work: if Mr. Vega is an employee, so is everyone who delivers a tangible good. Had the "nature of work" been determinative in Yoga Vida, non-staff yoga instructors and staff instructors alike would need to have been deemed employees. Instead, however, this Court held that substantial evidence did not support the Board's determination that non-staff yoga instructors were employees by relying on dissimilarities – having nothing to do with the nature of the work – between the non-staff instructors and the staff instructors (Yoga Vida, 28 NY3d at 1015). If the nature of the work holds as much importance as the majority declares it does today, the dissimilarities between the non-staff and staff instructors would have been irrelevant.

For that reason, the majority's reliance on Matter of Rivera (69 NY2d 679 [1986]), is misplaced. Simply because the employees at issue in Rivera were delivery persons does not make that case "indistinguishable" (majority op at 7). Although similar in many respects, there are several notable differences: Mr. Vega could accept a delivery

---

way or the other – that differences in the work of ophthalmologists and aluminum siding salespeople tend to make the former more controllable than the latter, or that our determination that the former were employees and the latter independent contractors had anything to do with the intrinsic nature of their occupations.

assignment and then later change his mind at any time, even after a customer had been told that Mr. Vega would deliver it, whereas there is no indication that the Rivera couriers could turn back a delivery assignment after accepting it; Mr. Vega was not given a time limit for completing deliveries, whereas the Rivera couriers were; Mr. Vega was free to choose any means of transportation he wished (which he could vary at will with no need to inform Postmates), whereas Rivera required its couriers to use motor vehicles and to purchase both ordinary insurance as well as special cargo insurance for their vehicles (Claim of Rivera, 120 AD2d 852, 854 [3d Dept 1986]).

The addition of a new factor to the control test illustrates the most concerning aspect of our ever-changing employment determination decisions. Because the test depends on innumerable factors, which vary from case to case and opinion to opinion, and we review the Board's determinations for substantial evidence, the Board is given unbounded discretion. We will never be able adequately to review their determinations because they will always rely on factors that we – at one point or another – have sanctified. "Substantial evidence" review of a smorgasbord of flavorless factors authorizes unrestrained agency decision-making.

Without regular examination, modification and explication of our common law, common-law tests risk falling into incoherence or vagueness. In the broader sense, this case implicates many factors upon which our Court and the Appellate Division have relied to reverse an agency determination as "unsupported by substantial evidence" because the courts have concluded that the facts relied on by the agency do not really speak to the ultimate issue of control (see e.g. Empire State Towing, 15 NY3d at 437; 12 Cornelia St.,

56 NY2d at 897-898; Ted Is Back, 64 NY2d at 726; Hertz, 2 NY3d at 733; Yoga Vida, 28 NY3d at 1015-1016).  Our several prior reversals of the Board's decisions, though offering that "the determination of the appeal board, if supported by substantial evidence on the record as a whole, is beyond further judicial review even though there is evidence in the record that would have supported a contrary decision'" (Empire State Towing, 15 NY3d at 437 [2010]), are best understood as reflecting our recognition that we cannot allow the deferential standard of review to shield the Board from all review, even if the Board has relied exclusively on factors we have deemed relevant in determining who is an employee.  Of course, the most important concern for us is to ensure that the law is clear and consistent as to what employers, workers and the lower courts must consider in forming and evaluating work relationships.  Our terse memorandum decisions do not serve that purpose.

We need a clear understanding, comprehending the modern realities of our rapidly evolving economy, of who should be an employee and who an independent contractor, including whether work relationships should continue to be measured on that dichotomy. It is past time for the law to reexamine the definition of work and its application to different forms of entitlement and obligation.  Our current framework, as inconsistently applied, fails to provide clarity to anyone involved.  The agencies tasked with applying our cases and the courts that attempt to review those decisions for substantial evidence oscillate in result and rationale.  The common-law test for status as an employee developed in a vastly different time, when employment was monotonic.  Now, it is cacophonic.  The number of workers performing multiple or alternative jobs has grown dramatically.  New technology and the rise of the sharing economy have driven further changes, including the

crowdsourcing of flexible and low-barrier-to-entry jobs upon which many workers are less reliant than our traditional notion of career employees. The challenge is how to apply our inconsistent common-law test in a world where work looks much different than it did when that test was developed and where we cannot, if we hold true to the deferential standard of review, reverse an agency determination so long as it has relied on some of the factors we have identified as relevant.

The stakes are high. As the California Supreme Court, confronting a similar question, phrased the matter (<u>Dynamex Operations W. v Superior Ct</u>., 4 Cal 5th 903, 912-13 [2018] [Cantil-Sakaute, C.J.]):

> "On the one hand, if a worker should properly be classified as an employee, the hiring business bears the responsibility of paying federal Social Security and payroll taxes, unemployment insurance taxes and state employment taxes, providing worker's compensation insurance, and, most relevant for the present case, complying with numerous state and federal statutes and regulations governing the wages, hours, and working conditions of employees. The worker then obtains the protection of the applicable labor laws and regulations. On the other hand, if a worker should properly be classified as an independent contractor, the business does not bear any of those costs or responsibilities, the worker obtains none of the numerous labor law benefits, and the public may be required under applicable laws to assume additional financial burdens with respect to such workers and their families."

> "Although in some circumstances classification as an independent contractor may be advantageous to workers as well as to businesses, the risk that workers who should be treated as employees may be improperly misclassified as independent contractors is significant in light of the potentially substantial economic incentives that a business may have in mischaracterizing some workers as independent contractors. Such incentives include the unfair competitive advantage the business may obtain over competitors that properly classify

similar workers as employees and that thereby assume the fiscal and other responsibilities and burdens that an employer owes to its employees. In recent years, the relevant regulatory agencies of both the federal and state governments have declared that the misclassification of workers as independent contractors rather than employees is a very serious problem, depriving federal and state governments of billions of dollars in tax revenue and millions of workers of the labor law protections to which they are entitled."[13]

Although it is well within the purview of the courts to alter a common-law test, that is best done incrementally; the complete overhaul of our common-law employment test to adapt it to the present and future economy is not a task to which courts are well suited.[14] Whether, to what degree, and on what basis we wish to provide unemployment benefits to Postmates couriers generally, or to other workers in the gig economy, is a policy question best left to the legislature. Whether the test for that entitlement should be the same as the test for Postmates' liability if a courier, speeding on an electrified bicycle to make a timely delivery

---

[13] See also Joint Task Force on Employee Misclassification, *Annual Report 2015*, https://www.labor.ny.gov/agencyinfo/PDFs/Misclassification-Task-Force-Report-2-1-2015.pdf (discussing at length the effect of employee misclassification on New York state in particular); Sarah Jeong, *Strike All You Want. Uber Won't Pay a Living Wage*, NY Times (May 10, 2019), https://www.nytimes.com/2019/05/10/opinion/uber-ipo.html (discussing studies showing that in New York City, about half of ride-hailing drivers are supporting families with children, but earn so little that 40 percent of those drivers qualify for Medicaid and another 18 percent qualify for food stamps); Noam Scheiber, *Uber and Other Gig Companies Maneuver to Shape Labor Rules*, NY Times (Mar. 26, 2019), https://www.nytimes.com/2019/03/26/business/economy/gig-economy-lobbying.html (discussing the "highly disruptive" effect of proposals to classify large numbers of gig workers as employees).

[14] Our call for a new test need not be preserved (majority op at 5 n 3). In fact, because the employment test is one created by the courts, it is our job to change it if necessary – regardless of if the parties call for it. However, it is the role of the legislature to make policy; here, where the majority's holding overturns a decision of this Court from just three years prior, it is clear we are in sore need of legislative decision-making, not solely judicial re-interpretation.

of a hot dinner, injures a pedestrian, is also a question best suited to legislative determination. The role of the courts is to interpret the law and to clarify it when we can. The accumulation of indecisive, unweighted factors articulated in our past cases, scrutinized under our highly deferential standard of review, typically produces either a de facto lack of review or an uninformative summary reversal. The resulting body of law is difficult to reconcile and does little to advise agencies and lower courts (to say nothing of business enterprises or workers) how any particular work relationship will or should be adjudicated. Today's decision places further stress on that test through its contradiction of our recent decision in <u>Yoga Vida</u> and its incompatibility with several others in which we found the Board lacked substantial evidence in circumstances less compelling than this. Nevertheless, until the legislature steps in, we have an obligation to do our best to reach consistent results so that both businesses and workers can structure their affairs with a sound understanding of when the benefits and obligations of "employment" are imposed or conferred upon them. Whether other Postmates couriers are employees is not before us. Mr. Vega's case is, and he is not.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Order reversed, with costs, and decision of the Unemployment Insurance Appeal Board reinstated. Opinion by Chief Judge DiFiore. Judges Stein, Fahey and Feinman concur. Judge Rivera concurs in result in an opinion. Judge Wilson dissents and votes to affirm in an opinion in which Judge Garcia concurs.

Decided March 26, 2020